Filed 9/8/21 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ALAMEDA COUNTY WASTE MANAGEMENT AUTHORITY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> WASTE CONNECTIONS US, INC., et al., <br><br> Defendants and Appellants. | A158323 <br><br> (Contra Costa County Super. Ct. No. CIVMSC18-01546) <br><br> **ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT** |

**THE COURT**:

It is ordered that the opinion filed herein on August 18, 2021, be modified as follows:

On page 3, in the first sentence of the first full paragraph beginning with "On appeal," delete the word "Management" and insert the word, "Connections."

There is no change in judgment.

Dated:_____ 

                                                 KLINE, P.J.

Trial Court: Contra Costa County Superior Court

Trial Judge: Hon. Steven K. Austin

Counsel:

Beveridge & Diamond, Eric L. Klein, Gary J. Smith, James B. Slaughter, for Defendants and Appellants.

Shute, Mihaly & Weinberger, Ellison Folk, Joseph D. Petta, and Andrew P. Miller, for Plaintiff and Respondent.

Cole Huber, Derek P. Cole, as Amicus Curiae on behalf of Plaintiff and Respondent.

Filed 8/18/21 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ALAMEDA COUNTY WASTE MANAGEMENT AUTHORITY,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>WASTE CONNECTIONS US, INC., et al.,<br><br>  Defendants and Appellants. | A158323<br><br>(Contra Costa County<br> Super. Ct. No. CIVMSC18-01546) |

  In 2016, Alameda County Waste Management Authority, a regional government entity responsible for managing disposal, recycling and reuse of waste generated in Alameda County (the Authority), sought records from three out-of-county landfills that disposed of waste originating in Alameda County. The Integrated Waste Management Act (the Act), Public Resources Code sections 40000-49260, permits local government entities to inspect and copy specified records kept by landfills concerning waste received at such landfills originating in the government's geographic jurisdiction. The legislation specifies two purposes for which local governments may conduct such inspections: "for the purposes of" verifying reports made by the landfills on "disposal tonnages by jurisdiction of origin" and "as necessary to enforce the collection of local fees." (Pub. Resources Code, § 41821.5,

1

subds. (a), (g)(2).[1])  The Authority repeatedly sought to inspect records for the second purpose.

The landfills and their corporate owner, Waste Connections US, Inc. (collectively Waste Connections), refused to permit the inspections, contending the statute did not apply because the Authority had not shown inspection of the records was "necessary" to enforce its fee ordinance.  The Authority responded that section 41821.5, subdivision (g)(2) does not require it to justify to Waste Connections why the records are required for collection of local fees.  Nonetheless, it attached a copy of its fee ordinance and explained that the fee depends on where tonnage originated, the type and amount of waste, and the party responsible for transporting the waste to the landfill, facts that are documented in landfill weight tags of the kind the statute allows government entities to inspect.

The Authority sued Waste Connections and its landfills under the Act, invoking a provision permitting it to petition the superior court for injunctive or declaratory relief to enforce its inspection authority.  (§ 41821.5, subd. (g)(3).)  After Waste Connections' constitutional challenges to the inspection statute were rejected by the court, the Authority filed a motion for judgment on the pleadings, which the superior court granted.  The superior court rejected Waste Connections' interpretation of section 41821.5, subdivision (g)(2) as requiring local governments to prove as a factual matter that they have a need for the records before a court may enforce their inspection authority.  It therefore granted the Authority's motion and compelled Waste Connections to allow the inspection.

---

[1]  Except as otherwise specified, "section" refers to the Public Resources Code.

2

On appeal, Waste Management argues the superior court erred in granting judgment on the pleadings, contending it was entitled to contest the Authority's need for the records as a factual matter. It acknowledges that if we do not interpret the statute to condition inspection rights on a factual showing of necessity, there are no other disputed facts that would preclude judgment on the pleadings.

We review issues of statutory interpretation de novo. Considering the words of section 41821.5, the Act of which the section is a part, the purposes of the Act, and the legislative history of the amendment, we conclude the "as necessary" language of the inspection provision requires neither a factual showing nor a factual determination. We therefore disagree with Waste Connections' contention that a "factual" issue precluded resolution of the case on the Authority's motion for judgment on the pleadings. The defenses pled by Waste Connections, all of which are predicated on its interpretation of the Act, fail as a matter of law. We therefore affirm the judgment.

## BACKGROUND

The Authority is a public agency formed in 1976 by a Joint Exercise of Powers Agreement among the County of Alameda, the 14 cities in that county and two sanitary districts that provide refuse and recycling collection services there. The Authority is responsible for waste management planning in Alameda County and facilitates implementation of the statewide Disposal Reporting System for the County.[2] It provides the planning and technical assistance necessary for ensuring that Alameda County and its cities meet

---

[2] Section 40976 provides that cities and counties may enter into memoranda of understanding with an agency formed under a joint powers agreement or a district established to manage solid waste for purposes of preparing and implementing an integrated waste management plan.

3

the state's mandates concerning the reduction of solid waste disposed of in California landfills.

The Act allows, but does not require, local governments to "impose fees in amounts sufficient to pay the costs of preparing, adopting, and implementing a countywide integrated waste management plan prepared" pursuant to the Act. (§ 41901.) In 2009, pursuant to the authority granted in the Act (*ibid.*), the Authority adopted an ordinance imposing tonnage-based fees for waste generation in Alameda County. The fees are imposed on all such waste, whether disposed of in or outside of the county. The Authority found the fees were necessary to fund the costs of preparing and implementing the Alameda County waste management plan. The ordinance requires landfill operators or haulers to collect and remit the fee for all waste generated in Alameda County that they deposit in their landfills or transport to a landfill or other solid waste facility.

Waste Connections, a Delaware corporation with its principal place of business in Texas, is an integrated solid waste services company that provides solid waste-related services across the United States. Three of its wholly owned subsidiaries are landfills operated in California in counties other than Alameda County.

The Authority and Waste Connections have long disputed whether Waste Connections landfills are obligated to allow the Authority to conduct "weight tag audits" or, stated otherwise, to provide unredacted weight tickets showing the haulers who delivered the material to its landfills. In 2014, after the Authority requested unredacted weight tags for Alameda County-generated waste deposited at Waste Connections' California landfills, the

state Department of Resources Recycling and Recovery (Cal Recycle)[3] informed Waste Connections that, pursuant to CalRecycle's regulations, Waste Connections was required to provide the records the Authority had requested. At the time, title 14 of the California Code of Regulations, section 18810.4 provided that landfill operators "shall prepare disposal reporting records and shall . . . [a]llow representatives of involved jurisdictions . . . to inspect the records during normal business hours in a single location within California." CalRecycle rejected Waste Connections' argument that California's trade secrets statute bars review of information by governmental agencies for a governmental purpose, and explained that the purpose for which the Authority was entitled to review the information was "verifying disposal reporting." In the prior year, however, CalRecycle had informed both the Authority and Waste Connections that its regulations did not require inspection of records "for the purpose of enforcing local ordinances" such as the Authority's local fee ordinance.

The following year, the Legislature amended the Act to add express inspection and copying rights for state and local governments, both for purposes of verifying tonnages and to enforce fee ordinances. (See Stats. 2015, ch. 746, § 1 (Assem. Bill No. 901); § 41821.5.) After the amendment took effect in 2016, the Authority again demanded inspection and copying of weight tickets at Waste Connections' California landfills receiving waste originating in Alameda County. Waste Connections refused to make the requested records available and instead filed suit against the

_____

[3] The entity originally responsible for integrated waste management in California was the Integrated Waste Management Board (the Board). In 2010, the Board was renamed and is now commonly referred to as "CalRecycle." (*PaintCare v. Mortensen* (2015) 233 Cal.App.4th 1292, 1299 & fn. 2.)

5

Authority in Kings County seeking to enjoin the Authority from seeking the records. After losing a battle over venue, Waste Connections eventually dismissed the case without prejudice in January 2018.

In June 2017 and February 2018, the Authority again requested that Waste Connections allow inspection and photocopying of the records pursuant to section 41821.5, subdivision (g). Waste Connections again refused to permit inspection or photocopying of the records. The Authority then filed this action seeking declaratory and injunctive relief under section 41821.5, subdivision (g)(3) to enforce its asserted right to inspect the weight tags it had been requesting from July 2015 through December 31, 2017.

Waste Connections filed an answer and a cross-complaint, challenging the amendment under various provisions of the state and federal constitutions.[4] After briefing and a hearing, the court sustained the Authority's demurrer to the cross-complaint.

In its answer to the Authority's complaint (as well as its own cross-complaint), Waste Connections admitted the basic facts relevant to the parties' dispute. It admitted that it was in the solid waste business and provided solid waste disposal, that it operated the three California landfill companies identified in the complaint, and that these landfills, from which the Authority sought records, received waste from Alameda County. It admitted that in 2016, shortly after Assembly Bill No. 901 took effect and pursuant to that section 41821.5, subdivision (g)(2), the Authority wrote to

---

[4] Waste Connections contended the inspection provision was an unreasonable search and seizure, an unconstitutional taking of its trade secrets, an excessive use of local government police powers and a violation of due process.

Waste Connections demanding inspection and copying of all weight tickets evidencing waste originating in Alameda County after July 1, 2015, that had been deposited in Waste Connections' California landfills. It admitted that it "safeguarded the secrecy" of the identity of its customers (i.e., haulers) and the volumes of the waste they dispose by redacting all weight tickets provided to the Authority to remove that information and by resisting the Authority's requests for that information. It admitted that it did so because it believed the data was a confidential trade secret and that the statute required Authority to demonstrate necessity for the records and the Authority had failed to do so.

In February 2019, the Authority filed a motion for judgment on the pleadings seeking dismissal of Waste Connection's answer, including its six affirmative defenses, and a final judgment allowing the Authority to inspect Waste Connection's landfill weight tags for waste originating in Alameda County. The Authority relied on undisputed facts derived from the pleadings and documents attached to a request for judicial notice that it filed with its motion. The Authority argued it was undisputed that it had requested and Waste Connections had refused to allow it to inspect the records identified in section 41821.5, subdivision (g)(2), that all of Waste Connections' defenses relied on an interpretation of that subdivision that required the Authority to demonstrate the records were "absolutely necessary" for fee enforcement, and that this interpretation of the statute was incorrect and should be rejected.

Waste Connections opposed the motion on the ground that it had "put in issue whether [the Authority] could satisfy the statutory requirement to demonstrate that access to [Waste Connections'] unredacted weight tickets was necessary for [the Authority] to enforce its local fees." That was enough to defeat the motion. Waste Connections argued the words "as necessary to

7

enforce the collection of local fees" should be interpreted to allow local government entities to obtain weight tags only "when necessary to enforce the collection of local fees."

The superior court granted judgment on the pleadings. It disagreed with Waste Connections' contention that the Authority had to prove necessity. Considering "[t]he context surrounding § 41821.5[, subdivision] (g)(2)'s use of the word 'necessary,' " it concluded that the statute "supports a broader sense of 'necessary,' *i.e.*, 'that which is . . . convenient, useful, appropriate suitable, proper or conducive' to ensuring compliance with subdivision (a) and local fee provisions." Further, it rejected Waste Connections' interpretation of "necessary" to "require an undefined 'prerequisite showing for production.' " The court granted judgment on the pleadings as to Waste Connections' affirmative defenses.[5]

On August 14, 2019, the superior court issued a final judgment compelling Waste Connections to "promptly make available for inspection and copying weight tags identifying the hauler, vehicle, quantity, date, type, and origin of waste, and relating to solid waste tonnage originating within Plaintiff's geographic jurisdiction of Alameda County and received on or after July 1, 2015, through December 31, 2018, at the disposal facilities operated [by Waste Management US Inc.'s subsidiaries] in Solano County, San Benito County and Kings County, California." Waste Connections timely appealed.[6]

---

[5] The court also ruled in the Authority's favor on the alternative ground that the Authority's request for records was a valid administrative subpoena. Because our decision is based on interpretation of the Act, we need not reach the subpoena issue.

[6] Waste Connections sought a writ of supersedeas in this court. We declined to stay the superior court decision, and Waste Connections complied with the superior court order. However, anticipating that the dispute will

8

## DISCUSSION

## I.

### *Motions for Judgment on the Pleadings*

A motion for judgment on the pleadings is similar to a demurrer in most respects, and we review de novo trial court rulings regarding both. (*Templo v. State* (2018) 24 Cal.App.5th 730, 735.)  Except as provided in the statute governing motions for judgment on the pleadings, Code of Civil Procedure section 438, the rules governing demurrers apply.  (Weil & Brown, Cal. Practice Guide, Civil Procedure Before Trial ¶ 7:275 (2019) (Weil & Brown).)  Like a demurrer, a motion for judgment on the pleadings attacks defects disclosed on the face of the pleadings or by matters that may be judicially noticed.  (*Southern California Edison Co. v. City of Victorville* (2013) 217 Cal.App.4th 218, 227; *Cloud v. Northrop Grumman Corp.* (1998) 67 Cal.App.4th 995, 999.)

There are some differences between a motion for judgment on the pleadings and a demurrer.  Unlike a demurrer, a plaintiff may move for judgment on the pleadings on the ground "that the complaint states facts sufficient to constitute a cause or causes of action against the defendant and the answer does not state facts sufficient to constitute a defense to the complaint."  (Code Civ. Proc., § 438, subd. (c)(1)(A); *City and County of San Francisco v. All Persons Interested in Matter of Proposition C* (2020) 51 Cal.App.5th 703, 712; compare Code Civ. Proc., § 438, subd. (c)(1)(A) with

recur between them if the statutory interpretation issue is not resolved by this court, the parties have urged us to decide this appeal.  And we agree that we should.  (See *Los Angeles Internat. Charter High School v. Los Angeles Unified School Dist.* (2012) 209 Cal.App.4th 1348, 1354 [where controversy was likely to recur between parties, appeal was not moot].)

9

*id.*, §§ 430.10, 430.20.) Where a plaintiff brings such a motion, we assume the defendant could have proven all of the factual allegations in its answer. (*Westly v. Board of Administration* (2003) 105 Cal.App.4th 1095, 1115.) "The issue is whether the [pleading] raises an issue that can be resolved as a matter of law." (*Ibid.*) Interpretation of a statute or constitutional provision is "purely a question of law" that may properly be resolved on a plaintiff's motion for judgment on the pleadings. (*Ibid.*)

In evaluating the sufficiency of the challenged pleading, we accept all material facts pleaded and those that arise by reasonable implication, but not conclusions of fact or law. (See *Rodas v. Spiegel* (2001) 87 Cal.App.4th 513, 517 [demurrer].) A party may not avoid a motion for judgment on the pleadings by omitting facts previously alleged in the same case or by suppressing such facts when they prove the pleaded facts false. (*Ibid.*) "In addition to the facts actually pleaded, the court considers facts of which it may or must take judicial notice." (*Ibid.*) "On appeal, we do not review the validity of the trial court's reasoning but only the propriety of the ruling itself." (*Ibid.*) We may also "take judicial notice of admissions in [a party's] opposition to the [motion]." (*Id.* at p. 518.)

Among the matters of which judicial notice may be taken are judicial admissions, i.e., admissions and inconsistent statements in the same case. In other words, "a court may take judicial notice of admissions or inconsistent statements by [a party] in earlier pleadings in the same lawsuit" and "may *disregard conflicting factual allegations* in the [challenged pleading]." (Weil & Brown, *supra,* ¶ 7:47, citing *Larson v. UHS of Rancho Springs, Inc.* (2014) 230 Cal.App.4th 336, 344 [demurrer]; *Pang v. Beverly Hospital Inc.* (2000) 79 Cal.App.4th 986, 989-990 [motion for judgment on pleadings].)

## II.

### *The Act*

### A. Assembly Bill 939:  The Integrated Waste Management Act

In 1988, in recognition of an "emerging solid waste crisis in California," the state Senate created a Task Force on Waste Management (Task Force) and charged it with developing " 'a comprehensive legislative program to help solve the solid waste crisis.' "  The Task Force issued its report the following year.[7]  The problem it described was dramatic.  Californians were disposing of about 40 million tons of solid waste each year, and it was estimated that amount would increase.  In the meanwhile, remaining landfill capacity was "shrinking rapidly in many parts of the State," and a number of California counties would run out of capacity within the decade.  Ninety percent of the state's solid wastes was being buried in landfill, with less than ten percent diverted through recycling.  Public opposition to siting new landfills had

---

[7]  The report is entitled "California's Waste Management Crisis—The Report of the Senate Task Force on Waste Management (June 1989)."  It is referred to in a number of legislative reports regarding the Act.  (See, e.g., Sen. Rules Com., Office of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 939 (Reg. Sess. 1989-1990) as amended Sept. 14, 1989, p. 6; Sen. Com. on Gov. Org., Staff Analysis of Assem. Bill No. 939 (1989-1990 Reg. Sess.) as amended Aug. 21, 1989, p. 5; Sen. Com. on Gov. Org., Staff Analysis of Assem. Bill No. 939 (1989-1990 Reg. Sess.) as amended June 7, 1989, p. 3; Sen. Com. on Nat. Res. and Wildlife, Gov. Org. Com. Staff Analysis of Assem. Bill No. 939 (1989-1990 Reg. Sess.) as amended Aug. 21, 1989, pp. 3-4.)  We take judicial notice of the Task Force Report and the Senate committee reports cited in this footnote sua sponte because they are part of the legislative history of the Act.  (See *Pacific Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal.4th 155, 160-162 [task force report on property taxes was a part of the relevant legislative history]; *Fashion Valley Mall, LLC v. County of San Diego* (2009) 176 Cal.App.4th 871, 878, fn. 7 [same]; Evid. Code, §§ 452, subd. (c), 459.)

increased in recent years because of real and perceived problems they present with hazardous waste, air quality and water quality.

The Task Force recommended comprehensive legislation adopting a statewide integrated waste management system requiring strong source reduction and recycling incentives, and reorganization and funding to aggressively undertake mandated initiatives and planning and permitting requirements. It observed that "[a] major failing of past State solid waste policies has been the lack of resources for State and local agencies to implement legislative mandates for solid waste management." Therefore, it recommended that the legislation establish funding mechanisms for state and local integrated waste management implementation, with state programs to be funded primarily by product charges and local programs to be funded by levying collection and disposal surcharges.

In the wake of the Task Force's report, the Legislature enacted and the Governor approved the Integrated Waste Management Act, commonly referred to as AB 939 (the Act), that same year (1989). (Stats. 1989, ch. 1095.) The legislative findings echoed the problems described by the Task Force. (See *id*., § 22 [§ 40000-40004, 40051].) The Legislature declared that "responsibility for solid waste management is a shared responsibility between the state and local governments," and directed the state to ensure "an effective and coordinated approach to the safe management of all solid waste generated within the state" and to "oversee the design and implementation of local integrated waste management plans." (*Id*., [§ 40001].)

The Act divides responsibilities for managing waste between the state and local governments and requires local governments to substantially reduce waste through source reduction, reuse and recycling, in turn lessening the amount of waste deposited in landfills. (Stats. 1989, ch. 1095, § 22

12

[§§ 40057, 41780, 40400, 40434, 40502, 40509].) Local governments must adopt and submit waste management plans that effectuate the Act's waste reduction mandates and report annually on their progress meeting those standards. (*Id.* [§§ 41000-41780, 41821].) The plans must place "primary emphasis" on source reduction, recycling and composting programs." (Stats. 1989, ch. 1095, § 22 [§§ 41000-41002, 41300-41302].) Counties must prepare countywide integrated waste management plans every five years, incorporating the cities' plans. (*Id.* [§§ 41750, 41770].)[8] Initially, all plans were required to include an implementation schedule that would divert 25 percent of all solid waste from landfill or transformation facilities by January 1, 1995, and 50 percent by January 1, 2000. (*Id.* [§ 41780].) The current goal is to divert 75 percent. (§ 41780.01.) Failure to submit a timely or adequate plan may subject local government entities to substantial fines. (§§ 41810-41813.)

Cities must identify funding sources available to pay for preparing, adopting and implementing the components of their plans. (Stats. 1989, ch. 1095, § 22 [§ 41230].) The Act authorizes cities and counties to impose fees, based on the type or amount of solid waste, in amounts sufficient to pay the costs of preparing and implementing waste management plans. (*Id.* [§§ 41900, 41901].) They may collect these fees directly or arrange for them to be collected and remitted by a solid waste hauler providing solid waste collection for that city or county. (*Id.* [§§ 41901, 41902].)

To enable accurate tracking of local governments' progress in reducing and diverting waste, the Act was amended in 1992 to require landfill

---

[8] The Act authorizes cities and counties to join forces or form districts to prepare and implement the planning requirements of the Act. (Stats. 1989, ch. 1095, § 22 [§ 41823].)

operators, to the extent practicable, to report periodically to each county the tonnages of waste from that jurisdiction that had been deposited at their facilities and required waste haulers to report to landfill operators the origin of the waste they delivered. (Stats. 1992, ch. 1292 (Assem. Bill No. 2494), § 44 [§ 41821.5, subd. (a)].) The amendment imposed similar obligations on recycling and composting facilities. (*Id.* [§ 41821.5, subd. (b)].) It required counties, in turn, to periodically report to cities, regional waste management entities and CalRecycle the amounts of waste disposed and the categories and amounts of waste diverted to recycling and composting facilities, by jurisdiction or region of origin. (*Id.* [§ 41821.5, subd. (c)].)

In 1994, the Legislature strengthened the reporting requirements, making them mandatory by eliminating the "to the extent practicable" language and authorizing CalRecycle to adopt implementing regulations (Stats. 1994, ch. 1227 (Assem. Bill No. 688), amending § 41821.5.) CalRecycle adopted regulations establishing a disposal reporting system, establishing record retention and quarterly reporting requirements for landfills, haulers and local jurisdictions, and requiring identification of waste by the jurisdiction of origin. (See 14 Cal. Code Regs., tit. 14, §§ 18813.4-18813.11, 18814-18814.11, 18815.1-18815.13.) In 2007, CalRecycle implemented an electronic disposal reporting system to simplify the reporting process for all reporting entities. (Assem. Bill No. 901 Sen. Rep., p.4); see Cal. Code Regs., tit. 14, § 18815.2, subd. (a)(44), (45).)

**B. Assembly Bill No. 901: 2015 Amendment of Section 41821.5**

Problems with reporting led the Legislature to streamline and strengthen the reporting process by amending section 41821.5 in 2015. (Assem. Bill No. 901 Sen. Rep., pp. 4-6); Stats. 2015, ch. 746, § 1.) The problems included noncompliance and tardiness on the part of landfills in

14

reporting to counties and tardiness on the part of counties in reporting to CalRecycle. (Assem. Bill No. 901 Sen. Rep., p. 5.) There had also been high profile cases of corrupt and fraudulent reporting by landfills, recycling facilities and their employees. (*Id*. at p. 6.) Three of the four cases involved theft or avoidance of fees. The Legislature amended section 41821.5 to streamline reporting and create enforcement mechanisms to ensure the timeliness and accuracy of waste disposal information. (Assem. Bill No. 901 Sen. Rep., pp. 4-5.)

As amended, section 41821.5 requires landfills and recycling facilities to submit information on disposal tonnages, by jurisdiction or region of origin, directly to CalRecycle and, in the case of landfills, to counties that request it. (Stats. 2015, ch. 746 (Assem. Bill No. 901), § 1 [§ 41821.5, subd. (a)].) Haulers continue to bear responsibility for providing landfills information on the origin of the solid waste they deliver to landfills. (*Ibid*.) Recycling and composting operations are required to report on types and quantities of materials disposed of, sold or transferred to CalRecycle. (*Id*. [§ 41821.5, subd. (b)(1)].) A new provision adds exporters, brokers and transporters of recyclables or compost as mandatory reporters. (*Id*. [§ 41821.5, subd. (b)(2)].) CalRecycle is authorized to provide this information, aggregated by company, to local jurisdictions on request. (*Id*. [§ 41821.5, subd. (b)(3)].) CalRecycle is required to adopt regulations to implement section 41821.5. (*Id*. [§ 41821.5, subd. (c)].) Enforcement provisions subject persons who fail to submit information, knowingly submit a false report, fail to allow inspection, fail to retain records or destroy or alter records for the purpose of falsifying them to civil penalties. (*Id*. [§ 41821.5, subds. (d)-(f)].)

The amendment added a subdivision (g) to section 41821.5 that addresses inspection rights for CalRecycle and local government entities.

15

Section 41821.5, subdivision (g)(1) provides, "Notwithstanding [trade secret laws], all records that a [landfill or recycling facility] is reasonably required to keep to allow [CalRecycle] to verify information in, or verification of, the reports required pursuant to subdivisions (a) and (b) and implementing regulations shall be subject to inspection and copying by [CalRecycle], but shall be confidential and shall not be subject to disclosure under the California Public Records Act . . . ."

Section 41821.5, subdivision (g)(2) provides, "Notwithstanding [trade secret laws], an employee of a government entity may, at the disposal facility, inspect and copy records related to tonnage received at [a disposal facility] on or after July 1, 2015, and originating within the government entity's geographic jurisdiction. Those records shall be limited to weight tags that identify the hauler, vehicle, quantity, date, type, and origin of waste received at a disposal facility. Those records shall be available to those government entities for the purposes of [section 41821.5,] subdivision (a) and as necessary to enforce the collection of local fees, but those records shall be confidential and shall not be subject to disclosure under the California Public Records Act . . . . Names of haulers using specific landfills shall not be disclosed by a government entity unless necessary as part of an administrative or judicial enforcement proceeding to fund local programs or enforce local franchises."

Finally, section 41821.5, subdivision (g)(3) provides, "A government entity may petition the superior court for injunctive or declaratory relief to enforce its authority under paragraph (2). The times for responsive pleadings and hearings in these proceedings shall be set by the judge of the court with the object of securing a decision as to these matters at the earliest possible time."

16

**C. Section 41821.5, Subdivision (g)(2) Authorizes Local
Government Entities to Inspect and Copy Landfill Records
Pertaining to Local Waste Without Precondition.**

At the crux of this appeal is Waste Connections' contention that section 41821.5, subdivision (g)(2), and specifically, the language "as necessary to enforce the collection of local fees," imposes a burden of proof on local government entities who seek to enforce their inspection rights to prove inspection is "necessary" to enforce collection of local fees. The Authority's rejoinder to this contention is that the "as necessary" language does not impose such a burden or prerequisite to inspection and means that which is convenient, or useful to local government entities in enforcing fee ordinances. In essence, the Authority contends "as necessary" is a shorthand for agencies with fee ordinances, and that the Legislature has already determined the specified records are useful for enforcing such ordinances.

"We review de novo questions of statutory construction. In doing so, ' "our fundamental task is to 'ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' " ' [Citation.] As always, we start with the language of the statute, 'giv[ing] the words their usual and ordinary meaning [citation], while construing them in light of the statute as a whole and the statute's purpose [citation].' " (*Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 135.) In determining legislative intent, " 'we first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction.' " (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082.)

For the reasons we set out below, we conclude section 41821.5, subdivision (g)(2) cannot plausibly be construed as Waste Connections would have us construe it. The context of subdivision (g)(2) does not support Waste

17

Connections' interpretation. Moreover, the purposes of the amendment, as reflected in its legislative history, and the purposes of the statute as a whole, would be thwarted by such a reading. The interpretation urged by the Authority, on the other hand, is both plausible and consistent with the language, context and purposes of the section and the Act.

**1.** ***In Context, the Phrase "As Necessary" Does Not Impose a Precondition on Local Government's Right to Inspection of Records.***

The "as necessary language" appears in a sentence in section 41821.5, subdivision (g)(2) that begins, "Those records *shall be available* to those government entities for the purposes of subdivision (a) and as necessary to enforce the collection of local fees . . . ." (§ 41821.5, subd. (g)(2), italics added.) Section 41821.5, subdivision (g)(3) provides, "A government entity may petition the superior court for injunctive or declaratory relief *to enforce its authority under paragraph (2)*." (Italics added.) These provisions read together suggest that "shall be available" refers to a mandatory requirement, not a conditional one, particularly because the mechanism provided for government entities "to enforce" their "authority" to inspect indicates inspection is a power or a right.[9]

Further, the usage of "as necessary" in the context of section 41821.5 as a whole, is consistent with the Authority's interpretation. Section 41821.5 is entitled "Submission of information by disposal and recycling facilities;

---

[9] See Dictionary.com/browse/authority (defining "authority" as "the power to determine adjudicate, or otherwise settle issues or disputes; jurisdiction; the right to control, command or determine"; "a power or right delegated or given"); Merriam-webster.com/dictionary/authority (defining "authority" as "power to influence or command thought, opinion or behavior"; "freedom granted to one in authority: RIGHT").

18

penalties for violation; maintenance of records." As its title suggests, the section imposes obligations on disposal facility operators and other waste handlers to provide information, some by way of periodic reports and some through inspection of records. Section 41821.5, subdivisions (a) and (b) concern reporting obligations, (c) through (f) address regulations and penalties for noncompliance and false reporting, and (g) addresses obligations to make certain records available for inspection and proceedings to enforce those inspection rights.

Section 41821.5, subdivision (g)(2) governs local governments' inspection and copying rights.[10] The first sentence provides local government entities the authority to inspect and copy specified records related to waste originating in their jurisdiction. The second specifies precisely which records they are entitled to inspect: "weight tags that identify the hauler, vehicle, quantity, date, type, and origin of waste received at a disposal facility." The third states the two purposes for which local government entities may use the records: (1) "for purposes of subdivision (a)," which we understand to mean to verify tonnages reported by landfills as originating from that local jurisdiction, and (2) "as necessary to enforce the collection of local fees." It also requires the records to be kept confidential. The fourth sentence protects information about the identity of haulers, prohibiting its disclosure in all but two circumstances.

The title and substance of section 41821.5 provide contextual support for the Authority's interpretation. The entire thrust of the section is about requiring landfills and recycling companies to provide information to state

---

[10] A "government entity" for purposes of section 41821.5 means a "city, county or [approved] regional agency." (§§ 41821.5, subd. (g)(4), 40145, 40976.)

19

and local government entities concerning the tonnages of disposed waste emanating from local jurisdictions. Further, the section emphasizes enforcement of state and local governments' rights to receive reports and to inspect the records. In particular, there are penalties for failure to report and for falsifying information and there is an injunctive or declaratory relief remedy for local government entities to enforce their inspection authority. (§ 41821.5, subds. (c)-(f), (g)(3).) There are protections for landfills and recycling companies, such as keeping records confidential, limiting the scope of the records subject to inspection, and limiting the purposes for which records may be used. None of these protections explicitly denies government access to information the statute authorizes it to receive or inspect.

In short, read in the context of the entire section, the language "as necessary to enforce the collection of local fees" means local agencies with fee ordinances are entitled to inspect and copy the records identified in section 41821.5, subdivision (g)(2). It does not impose as a precondition any factual showing of necessity.

### 2. *The Surplusage Argument.*

Waste Connections contends that unless the words "as necessary" are read to impose a burden on local government entities of proving factual necessity as a prerequisite to inspection the language will be "surplusage" and have no meaning. We do not agree.

First, the language "as necessary" does not inevitably mean *essential*, as Waste Connections argues.[11] As the parties point out, courts have

---

[11] Waste Connections argues the Authority failed to allege or prove it "need[s]" "*Waste Connections*' records, not just any records," that the information is not "available from other sources," and "why Waste Connections' hauler identification records . . . are necessary *in addition* to all

interpreted the word "necessary" in different ways depending on its context. (See *M'Culloch v. Maryland* (1819) 17 U.S. 316, 413-414 [interpreting "necessary" in necessary and proper clause to mean "employing any means calculated to produce the end, and not as being confined to those single means, without which the end would be entirely unattainable"]; *San Francisco Fire Fighters Local 798 v. City and County of San Francisco* (2006) 38 Cal.4th 653, 672, 674 (*San Francisco Firefighters*) [holding "necessary" in context of Charter provision was intended "in its broader sense, i.e., 'that which is . . . convenient, useful, appropriate, suitable, proper or conducive' "]; *Estate of Kerkorian* (2018) 19 Cal.App.5th 709, 720 [concluding phrase "as necessary," in the context of Probate Code section 11704, subdivision (b), was used "in its 'useful' or 'appropriate' sense, and not as a freestanding requirement satisfied only by a showing of indispensability"]; *Pacific Gas & Elec. Co. v. Hay* (1977) 68 Cal.App.3d 905, 911, 913 [eminent domain statute requiring taking of property be necessary to public use did not require "factual showing of absolute necessity" but only "a reasonable or practical necessity"]; see also *People v. Belous* (1969) 71 Cal.2d 954, 960 [law banning abortion except where "necessary to preserve" life of mother was unconstitutionally vague, noting "[d]ictionary definitions and judicial interpretations fail to provide a clear meaning for the words, 'necessary' or 'preserve' "].)

Nor does "as necessary" inevitably mean, as Waste Connections argues, that landfill operators can raise a "factual defense" to an inspection demand, forcing local government entities to engage in discovery, make evidentiary showings and obtain judicial findings of "necessity." The question is who

of the detailed information about Alameda County's solid waste to which the Authority already has access."

21

determines what is "necessary" under the statute, and here the Legislature could well have decided for itself that inspection and copying of the specified records is "necessary" for enforcement of local fee ordinances or could have given local governments discretion decide that issue.  Again, the context of the language supports the Authority's interpretation, which is that "as necessary to enforce collection of local fees" is simply a shorthand "for government entities that have adopted fee ordinances pursuant to section 41901."  As the Authority points out, not all local jurisdictions necessarily have fee ordinances; the Act permits, but does not require, them to impose fees.  (§§ 41900, 41901.)  The Authority argues that the Legislature's specific identification of a very narrow set of records and its directive that such records "shall be available to government entities . . . as necessary to enforce collection of fees" simply means that local government entities with fee ordinances are entitled to inspect those records.  Under the Authority's interpretation, there is no factual question to be litigated or determined, since the superior court granted judicial notice of the Authority's fee ordinance, and Waste Connections does not dispute that the Authority adopted the ordinance.

This interpretation does not render the language devoid of meaning or otherwise "surplusage."  "As necessary" is not without significance.  It means that local government entities *with fee ordinances* have authority to use the records for a second purpose, i.e., to enforce those ordinances.  Government entities without such fees, on the other hand, may inspect, copy and use records only for the purpose of verifying reported tonnages used to determine their diversion rates.  In short, Waste Connections' surplusage argument lacks merit.

22

### 3. *Waste Connections' Proffered Interpretation Would Undermine the Legislative Purposes of Both Assembly Bill No. 901 and Assembly Bill No. 939.*

The legislative history of Assembly Bill No. 901 also supports the Authority's interpretation. It indicates that, in amending section 41821.5, the Legislature was concerned about ensuring *timely* access to records. Besides streamlining the reporting process because of delays resulting in part from landfills' failures to report timely and failures to report at all, the Legislature sought to ensure *prompt* access to records for verification purposes. Thus, the mechanism it provided government entities to enforce the inspection requirement is an expedited one. "A government entity may petition the superior court for injunctive or declaratory relief to enforce its authority under [section 41821.5, subdivision (g)(2)]. The times for responsive pleadings and hearings in these proceedings shall be set by the judge of the court *with the object of securing a decision as to these matters at the earliest possible time*." (§ 41821.5, subd. (g)(3), italics added.) Waste Connections' proposed interpretation of "as necessary" to impose a burden on local governments to prove necessity in proceedings entailing discovery, presentation of evidence and factual findings would thwart this overarching legislative goal of timely reporting and verification.

The legislative history also underscores the importance of verification both for measuring diversion and for enforcement of fees. As we have already discussed, noncompliance with reporting requirements *and* theft and avoidance of fees were the concerns that led to the amendment. The Senate Rules Committee Report on Assembly Bill No. 901 describes four high-profile incidents in which landfills and a recycling facility reported false information. Three of those incidents involved avoidance or theft of fees. (Assem. Bill No. 901 Sen. Rep., p. 5.) Such false reporting, the Report states, "*can defraud*

23

*local jurisdictions and the state out of millions of dollars in revenue.*" (*Ibid.*, italics added.) The Senate Rules Committee Report further observes, "California has set a goal of achieving a recycling rate of 75% by 2020. Many actions will be needed to achieve that goal, but *most importantly it will be necessary to have accurate and timely data on waste disposal and recycling.*" (Assem. Bill No. 901 Sen. Rep., p. 4, italics added; see also Sept. 10, 2015 letter from bill author to Chief Clerk of the Assembly published in Assembly Daily Journal on Sept. 12, 2015, at p. 3223 ["This inspection authority is critical to verifying the information provided to CalRecycle and local jurisdictions"].) Imposing an evidentiary showing requirement and burden of proof on local governments to show necessity as a prerequisite to inspection would also undermine the legislative purpose of preventing theft and avoidance of local fees. The Authority's interpretation, which would allow all local government entities with fee ordinances to obtain and use the records for fee enforcement purposes, without condition, by contrast, would further those legislative aims.

The broader purposes of the entire Act likewise would be ill-served by Waste Connections' interpretation and well-served by the Authority's. Key among the Act's purposes is its requirement that local jurisdictions adopt and implement plans to reduce reliance on landfills by maximizing diversion of waste. (§ 40052.) As we have already described, the Task Force report that led to the enactment of Assembly Bill No. 939 observed that the state's existing legislation and policies favoring reduction of waste and recycling over disposal in landfills had been ineffective and over 90 percent of waste was still being disposed of in landfills. "A major failing of past State solid waste policies," the Task Force report observed, was "the lack of resources for State and local agencies to implement legislative mandates for solid waste

24

management" and "[e]ffective implementation of an IWM [integrated waste management] system will require that proper funding mechanisms be established." To that end, the Task Force recommended that the government "determine the level of funding needed" to implement an IWM system and establish state and local funding mechanisms. For local governments, it recommended the Legislature "[p]rovide funds . . . by expanding local authority to levy collection and disposal surcharges."

The Legislature did just that. It included a provision authorizing counties and cities to "impose fees in amounts sufficient to pay the costs of preparing, adopting, and implementing a countywide integrated waste management plan prepared pursuant to this division." (§ 41901.) And when it revised the reporting provisions and adopted the inspection provisions in section 41821.5, it was concerned about false reporting that deprived both state and local governments of fees. (Assem. Bill No. 901 Sen. Rep., p. 5 ["This authority is needed because, according to CalRecycle, two-thirds of DRS reports are late, incomplete, or inaccurate. Timely and accurate reports are needed if we are to achieve our goal of 75% recycling. Furthermore, *inaccurate reporting can defraud local jurisdictions and the state out of millions of dollars in revenue*"], italics added.) The remedy was to permit inspection of records to verify the tonnages, not only for purposes of ensuring diversion rates were accurate, but also to verify that state and local governments were receiving the fees they need to fund their waste management efforts. Again, making inspection more difficult and delaying it with litigation over whether "necessity" is present would hobble the inspection provision in section 41821.5, subdivision (g)(2) and hamper local governments' ability to collect fees to fund their state-imposed waste management obligations.

25

In short, the legislative history of the Act generally and the amendment of section 41821.5 support the Authority's interpretation and refute Waste Connections'.

### 4. *The Proprietary Records and Misuse Arguments*

Waste Connections contends that the "as necessary" language was included to protect against disclosure, and prevent potential misuse, of proprietary records. Those dogs won't hunt.

The "as necessary" language does not apply to the records obtained for the purpose of verifying tonnages used to determine diversion rates under section 41821.5, subdivision (a). However, any potential for "misuse" that may exist would exist regardless of the stated purpose for which the records were obtained. Under Waste Connections' interpretation, a local government entity may inspect weight tags to verify the accuracy of reported tonnages used to calculate its diversion rate without any showing of necessity, but if the same government entity seeks to inspect *the same records* to verify the accuracy of the *same reported tonnages* in order to determine whether haulers are remitting all of the local fees that are due, it must first demonstrate necessity. Waste Connections fails to explain why the Legislature would have imposed a burdensome proof requirement on local government entities[12] as a precondition to inspection when undertaken for one—but not the other—of two permissible purposes.

Nor are we persuaded that the "as necessary" language was intended to address concerns about the disclosure of proprietary information. The Legislature directly addressed the issue of trade secrets and sensitive

---

[12] Waste Connections' interpretation inevitably would result in delay, as this case demonstrates. Five years have elapsed since the Authority sought to inspect the records.

26

proprietary documents. First, it specified the inspections are authorized "[n]otwithstanding" trade secret laws. (§ 41821.5, subd. (g)(2).) Second, although inspection is not barred by those laws, the Legislature limited the purposes for which the records may be used, required that they be kept confidential and provided that they would not be subject to disclosure under the Public Records Act. It also specified that hauler identity can only be disclosed in certain administrative and judicial proceedings. And again, if the "as necessary" language had been intended to reduce local government's access to proprietary information, the Legislature would have imposed the burden on any access to the records, not just access for fee purposes.

In short, we conclude that the meaning the Legislature intended by the phrase "as necessary to enforce the collection of local fees" is that local government entities who funded their waste management responsibilities by imposing fees could use the information they are entitled to inspect for the additional purpose of verifying the tonnages on which those fees are based. (See § 41901 ["The fees shall be based on the types or amounts of the solid waste . . ."].) The Legislature, aware of waste handlers' ability to defraud local governments of fees, determined the specified records would be useful for that purpose. Thus, the Act authorized the Authority to inspect and copy the records of Waste Connections and its landfills related to tonnage received at those facilities on or after July 1, 2015, and originating within the Alameda County, including weight tags identifying the haulers, vehicles, quantities, dates, types, and origins of the waste received, and to do so without precondition.

**D. The Authority Was Entitled to Judgment on the Pleadings.**

As we have indicated, the parties' pleadings reflect no dispute as to the material facts, which in essence are that the Authority requested the records

27

pursuant to section 41821.5 and Waste Connections refused to provide them in an unredacted form, instead removing the identities of the haulers who delivered the waste to Waste Connections' landfills. The issue where there is a real dispute is a legal one, regarding the interpretation of section 41821.5, subdivision (g)(2) of that section, and specifically, the words "as necessary."

In its appellate briefs, Waste Connections' arguments are all premised on *its* interpretation of the statute as requiring a factual showing of necessity. According to the opening brief, this case "turns on" "what private confidential business records, if any, are 'necessary' for a local waste industry regulator to review in order to enforce its local fees." It contends it was entitled to litigate this "factual" issue and that the superior court acted "prematurely" in granting judgment on the pleadings, depriving it of this "properly-pled defense."

At oral argument, we asked Waste Connections' counsel whether, if we disagreed with his interpretation of section 41821.5, there were other factual issues that precluded the grant of judgment on the pleadings. He responded that there were none and conceded that if we disagreed with his interpretation the appeal would fail.

Waste Connections' arguments fail because, as we have explained, the statute requires no showing of factual necessity and thus the pleadings present no factual issue. Rather, the Legislature itself determined that local governments' access to specified documents, including hauler information, is necessary to enforce such local fee requirements for those local governments that have adopted fee ordinances under section 41901. Given our interpretation, nothing in Waste Connections' answer raises a legally viable defense to the Authority's claims. This is true with respect to the answer's denials and general allegations and its affirmative defenses. Waste

28

Connections argues only that those defenses "raise a factual defense on the key issue in contention between the parties: whether the Authority actually *needed* years of Waste Connections records . . . in order to enforce Alameda County fees."[13] Having determined, however, that the Authority is not required to show "actual need" for the records, we conclude the affirmative defenses fail to state defenses as a matter of law.[14]

## DISPOSITION

The judgment is affirmed. The Authority shall recover its costs on appeal.

---

[13] For example, it contends its affirmative defense alleging the Authority failed to adequately supervise the haulers and this was the cause of any misreported fees, provided a basis for a factfinder to "conclude that the Authority did not yet *need* all these Waste Connections records in order to enforce those fees."

[14] Our dissenting colleague suggests that the fact that the Authority's own fee ordinance requires handlers of solid waste in Alameda County to report to the Authority the quantities and destinations of the solid waste, including all destination landfills in California and their addresses, demonstrates that it has other means of obtaining the information it seeks. (Dis. Opn. at pp. 3, 16.) Even if "as necessary" is interpreted to mean "useful" or "convenient," he argues, judgment on the pleadings should have been denied because Waste Connections was entitled to show the records would not even be useful or convenient to the Authority.

We cannot agree. First, Waste Connections and its landfills are not located in Alameda County and thus are not within the reach of the Ordinance. To inspect their records, the Authority must rely on the authority provided by section 41821.5, subdivision (g)(2). Second, landfills have been guilty of fraudulent reporting and underpayment of government fees. Inspecting and comparing information from haulers and information from the disposal facilities where they have deposited Alameda County's waste will enable the Authority to ensure that neither the landfills nor the haulers are avoiding their fee obligations.

29

_____

STEWART, J.

I concur.

_____

KLINE, P.J.

*Alameda County Waste Management Authority v. Waste Connections US, Inc.*
(A158323)

30

RICHMAN, J.

I respectfully dissent.

My disagreement with the majority is about the following language in the Integrated Waste Management Act: "[A] government entity may, at the disposal facility, inspect and copy records related to tonnage received at the facility. . . . Those records shall be available to those government entities . . . and as necessary to enforce the collection of local fees . . . ." (Pub. Resources Code, § 41821.5, subd. (g)(2) (section 41821.5).)[1]

The majority construe this language, and particularly the words "as necessary," as imposing no obligation on the governmental entity to demonstrate that an inspection demand for records is in fact related to the bona fide collection of fees the governmental entity is authorized to impose.

I read the words "as necessary to enforce the collection of local fees" very differently. To me, the plain import of these words is not a grant of unchecked power to local government. It cannot be that a governmental entity has only to assert that its inspection demand is "necessary to enforce the collection of . . . fees." And I do not believe the Legislature intended to make that simple assertion completely immune from judicial scrutiny.

The same statute that authorizes record inspection provides that a governmental entity "may petition the superior court . . . to enforce its authority" to inspect tonnage records. (§ 41821.5, subd. (g)(3).) The majority's interpretation would not let a court determination whether the inspection demand was bona fide or bogus. No, as they would have it, "the 'as necessary' language of [section 41821.5] requires neither a factual showing nor a factual determination" that the claimed necessity was genuine. (Maj.

---

[1] All further statutory references are to the Public Resources Code unless otherwise specified.

1

Opn., at p. 3.)  I cannot believe the Legislature meant to reduce that judicial proceeding to "an arid ritual of meaningless form" (*Staub v. City of Baxley* (1958) 355 U.S. 313, 320), making a superior court judge little better than a potted plant.

**The Statutory Scheme**

The Act, better known as "AB 939" its enabling legislation (and as it will usually be referred to here), is found at Public Resources Code section 40000 et seq.  (Assem. Bill No. 939 (1989–1990 Reg. Sess.); see Stats. 1989, ch. 1095, § 22.)  The stated purpose of AB 939 is to "reduce, recycle, and reuse solid waste . . . to the maximum extent possible."  (§ 40052.)  Among other things, it requires that at least 50 percent of city and county solid waste be diverted from landfill disposal.  It also seeks to ensure that by the year 2020, 75 percent of solid waste is reduced, recycled, or composted.  (§§ 41780, subd. (a); 41780.1, subd. (a).)  To achieve these goals, local governments must adopt and implement waste management plans that "quantify all solid waste generated" and establish waste reduction and diversion programs.  (§§ 40901, 41750.)  And under AB 939, local agencies may enact solid waste fees based on the type and amount of waste generated within their jurisdiction, which are to pay for the implementation of waste diversion programming and help achieve the state's aggressive diversion requirements.  (§ 41901; see also §§ 40901, subd. (a); 41780, subd. (a); 41780.01, subd. (a); and 41750.)

The majority discusses various parts of the pertinent legislation, including some aspects of Alameda County Ordinance 2009-01.  Nowhere mentioned in the majority opinion, however, is the aspect of the Ordinance which, as the Authority itself describes it, "established procedures and reporting requirements for the collection of the $4.34 fee on each ton of solid waste deposited within or outside of Alameda County."  Not only did the

2

Ordinance allow the Authority to collect the $4.34 fee, it also allows it to collect comprehensive information and records regarding the solid waste haulers operating in Alameda County. Thus, for example, the Ordinance requires direct data and records reporting from any individual or company handling solid waste in Alameda County, including "the weight of Solid Waste physically collected from within each Jurisdiction of Origin, the Permitted Waste Facilities or other Solid Waste Enterprises to which Solid Waste is delivered, and the weight of Solid Waste that is ultimately Deposited in Landfills and therefore subject to the Facility Fee." (See Alameda County Ord. 2009-01, § 7 (a).) In short, all handlers of solid waste in Alameda County must report monthly to the Authority quantities, origins, and destinations of all solid waste, including all destination landfills in California and their addresses. (*Id.*, §§ 3(a)–(m), 7(a), 7(a)(1)–(4), 7(b).) And all records documenting this reporting must be retained by the solid waste handlers for five years—and be provided to the Authority upon request. (*Id.*, § 9.)

The Authority's responsibilities include ensuring that the county (and its cities) comply with California's waste management laws and also developing the Countywide Integrated Waste Management Plan. The Authority's activities are funded by its "939 Fee," which implements a fee of $4.34 on each ton of solid waste originating within the county that is disposed of in a California landfill. And pursuant to the Authority's 939 Fee Ordinance, all haulers of waste originating in Alameda County are required to pay the 939 Fee whether they dispose of their waste at an Alameda County landfill or one out-of-county. (Alameda County Ord. 2009-01, § 2(e).)

In October 2015, the Legislature passed Assembly Bill No. 901, amending AB 939 in various ways, which amendment took effect on January

3

1, 2016.  (Assem. Bill No. 901 (2015–2016 Reg. Sess.) Stats. 2015, ch. 746, §§ 1–5.)  Three paragraphs of the amended section 41821.5 are pertinent, most significantly for the issue before us here, subdivision (g)(2), which provides in pertinent part as follows:  "an employee of a government entity may, at the disposal facility, inspect and copy records related to tonnage received at the facility on or after July 1, 2015, and originating within the government entity's geographic jurisdiction.  Those records shall be limited to weight tags that identify the hauler, vehicle, quantity, date, type, and origin of waste received at a disposal facility.  Those records shall be available to those government entities for the purposes of subdivision (a) and as necessary to enforce the collection of local fees."

**The Facts**

On January 8, 2016, a week after the revisions to section 41821.5 went into effect, the Authority sent a letter to Waste Connections requesting documents from its facilities in Kings, San Benito, and Solano counties.  The letter requested that the Authority be allowed to inspect and copy all of Waste Connection's "weight tag" records statewide, reflecting "received waste identified as originating from within Alameda County" dating back to July 1, 2015, the earliest available date under the statute.  The letter made clear the request included the identities of individual waste haulers, which are part of "weight tag" records, though the agency promised not to publicly reveal those identities unless administratively or judicially required.  The letter also stated that the Authority was "making this request for the purposes of collection of local fees."

Following a letter from Waste Connections seeking clarification, on January 22, a lawyer for the Authority sent another letter renewing its request for the records.  The January 22 letter explained that the Authority

4

was seeking to review "the complete disposal record attributable to Alameda County," i.e., the identity and disposal records of all individual haulers bringing waste from Alameda County to any Waste Connections landfill in California, thus seeking access to Waste Connections's entire statewide set of data relating to Alameda County, including the identity of all of its California customers disposing of waste from the county. As the letter put it, "The scope of our inquiry is thus to inspect and copy all weight tickets issued at [Waste Connections] owned or operated disposal facilities within the State of California for waste which has a jurisdiction of origin within Alameda County." This letter also expressly noted that the purpose of the Authority's request for the documents was the "collection of local fees."

As will be seen, the Authority has never explained—not in either letter, not in any of the pleadings it has filed—why its own information reporting and collection law is not sufficient to gather the data it needs, nor why it needs production of all of Waste Connections's statewide records.

**The Proceedings Below**

On May 9, 2018, the Authority filed in Alameda County a complaint, and shortly thereafter an amended complaint, for declaratory and injunctive relief.[2] It named four defendants, Waste Connections and the operators of the three landfills, and sought an injunction ordering Waste Connections to make available for inspection a broad range of records from the three landfills going back to 2015, over three and one-half-years.

On August 23, Waste Connections filed its verified answer, a 12-page pleading that denied, paragraph by paragraph, various allegations in the complaint, and also asserted 24 affirmative defenses. Waste Connections

_____

[2] The majority refers to a "petition," the term used in section 41821.5, subdivision (g)(3). What the Authority filed was a complaint.

5

also filed a cross-complaint for declaratory and injunctive relief, which among other things alleged that the Authority's inspection request violated the Fourth Amendment.

As the majority notes—without a complete discussion—on October 11, the Authority filed a demurrer to the cross-complaint, accompanied by a request for judicial notice of over 90-pages of documents. The demurrer was set for hearing in Department 15, to which the matter had been assigned for all purposes. Waste Connections filed opposition, the Authority a reply, and the demurrer came on for hearing on January 7, 2019, prior to which the court had issued a tentative ruling sustaining the demurrer without leave to amend. Waste Connections contested, and at the conclusion of a brief hearing the court announced it would adopt the tentative decision.

On January 17, the court filed its order sustaining the demurrer without leave to amend, which in part provided that the inspection requests " 'are sufficiently limited in scope, relevant in purpose, and specific in directive.' *See v. Seattle* [(1967)] 387 U.S. [541,] 544." What the majority does not mention, however, is that the order expressly noted that Waste Connections would later have the right to challenge the ruling, noting that "There is an opportunity for judicial review as provided at [Public Resources Code section 41821.5, subdivision (g)(3)]."[3]

As will be seen, it was not to be.

The parties stipulated that 18 of the 24 affirmative defenses would be removed leaving six remaining. So, with the cross-complaint removed from

---

[3] Section 41821.5, subdivision (g)(3) provides: "A government entity may petition the superior court for injunctive or declaratory relief to enforce its authority under paragraph (2). The times for responsive pleadings and hearings in these proceedings shall be set by the judge of the court with the object of securing a decision as to these matters at the earliest possible time."

6

the case, what remained was only the Authority's complaint and Waste Connections's verified answer and the six affirmative defenses.

On February 22, 2019, the Authority filed a motion for judgment on the pleadings on the complaint. It was set for hearing in Department 15, where the demurrer had been heard. But on February 27, the matter was reassigned to Department 33. Waste Connections filed opposition , and the Authority a reply along with a supplemental request for judicial notice. The motion came on for hearing on May 2 in Department 33, prior to which the trial court had issued a tentative ruling granting the motion. And at the conclusion of a lengthy hearing, the court took the motion under submission.

On June 21, the court filed its order granting the motion, in the course of which it rejected Waste Connections's primary argument that subdivision (g)(2) requires an agency to make a showing of necessity before it may inspect hauler weight tags. The court noted that such showing was unnecessary because the Authority's request was a valid administrative subpoena and thus established that reasonableness of the Authority's request for documents. And the trial court also found, under what it asserted were established principles of statutory interpretation, that subdivision (g)(2) does not require agencies to make a factual showing of necessity prior to exercising their right to inspect hauler weight tags. Rather, to the extent that subdivision (g)(2) authorizes agencies to use weight tags "as necessary" for fee enforcement, it simply recognizes that not all agencies will find weight tags "useful" for that purpose.[4]

Notably, despite the express statement in the earlier order sustaining the demurrer—that Waste Connections would have the right to "judicial

---

[4] The court also granted the Authority's request for judicial notice, as had the court in sustaining the demurrer.

7

review"—the order granting judgment on the pleadings referred to that earlier ruling and observed, however conclusory, that the court had "already determined that the administrative subpoena at issue is valid." In short, one trial judge first concluded that the Authority's request was akin to a valid administrative subpoena in part *because* there would be an opportunity for judicial review, and later a different trial judge denied any substantive judicial review because the request had already been "determined" to be a valid administrative subpoena. Lost in this circular process was any actual opportunity for judicial review of the Authority's inspection request, whether it was a subpoena or not—not to mention that it denied Waste Connections the opportunity to challenge the scope, relevance, or reasonableness of the purported subpoena.

On August 14, the court entered its judgment, and on August 29, Waste Connections filed its appeal.

## DISCUSSION

**Introduction and Summary of the Parties' Positions**

As quoted above, subdivision (g)(2) provides that the records provided for in the statute "shall be available . . . for the purposes of subdivision (a) and as necessary to enforce the collection of local fees." The focus was, and is, on the "as necessary" language, as the Authority has never asserted, not in its letters, not in any pleading, that it is seeking the records for the purposes of subdivision (a).[5]

---

[5] As noted, both letters from the Authority expressly state that the Authority wanted the records to enforce its local fees. Moreover, the "purposes" of subdivision (a) do not involve the hauler identification data that the Authority is seeking in this case. (See § 41821.5, subd. (a).) Finally, Waste Connections voluntarily produced the records required by subdivision (a).

The position of the Authority—a position with which the trial court fundamentally agreed, the position the majority readily adopts—is that a showing of "necessary" is not a predicate to inspection. In the Authority's words, "Nothing in this language suggests that the term 'as necessary' was intended as a restrictive constraint on public agencies' ability to obtain weight tag records in the first instance." Elaborating, the Authority asserts that because section 41821.5 defines the documents that may be inspected, the Legislature "effectively determined the documents that would assist the agencies in verifying waste disposal reports and fee enforcement efforts." And, the Authority asserts, "as necessary" appears in the sentence describing how the Authority may "use" the information, not what information it can collect.

In claimed support, the Authority asserts that courts have recognized "use of the word 'necessary' must be understood in context," citing *Estate of Kerkorian* (2018) 19 Cal.App.5th 709, 720. The Authority also cites *San Francisco Fire Fighters Local 798 v. City and County of San Francisco* (2006) 38 Cal.4th 653, 674, 673, which noted that "city action [] . . 'necessary' to ensure compliance with antidiscrimination laws" meant action that is "convenient, useful, appropriate, suitable, proper or conductive" to ensure compliance.

Waste Connections contends that Authority must demonstrate that the records are "necessary" for some proper purpose, that the records "are only 'available . . ' (i.e., for inspection) to the Authority '. . . as necessary' to enforce local fees. This interpretation harmonizes the two prongs of the sentence, which are both independent, purpose-based limitations on the 'availability' of the records: (1) 'for the purposes of [§ 41821.5(a)]' and (2) 'as necessary to enforce the collection of local fees.' " Such interpretation is consistent with a

9

fundamental rule of statutory construction, in interpreting the meaning of a statute, we look at its words and give them their "usual and ordinary meaning." (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601.) "The statute's plain meaning controls the courts' interpretation unless its words are ambiguous. If the plain language of a statute is unambiguous, no court need, or should, go beyond that pure expression of Legislative intent." (*Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19Cal.4th 851, 861.) And, of course, courts "should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage." (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 22, citing *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798–799.)

As Waste Connections distills its position, "The provisions in section 41821.5 applying to landfill data reporting are actually quite simple. Subdivision (a) requires a landfill to report—to CalRecycle and to counties that request the information—only aggregate tonnages disposed of at the landfill, broken down by jurisdiction and region of origin. Subdivision (g)(2) provides that counties—in addition to the requests for aggregated data allowed by subdivision (a)—can also seek to review records identifying individual haulers 'as necessary' to enforce local fees. Finally, subdivision (g)(1) allows CalRecycle—but not counties—to review landfill records to 'verify' the aggregated information submitted by landfills pursuant to subdivision (a)."

In short, Waste Connections contends that subdivision (g)(2) gives the Authority the right to inspect hauler identification records only "as necessary" to enforce local fees, something the Authority did not even plead, let alone prove. So, Waste Connections concludes, the judgment on the pleadings cannot stand. I would agree.

**Judgment on the Pleadings Was Error**

**Introduction**

The Authority's amended complaint never mentions the term "as necessary," but rather alleges that the fee ordinance "necessitates information about the source, tonnage, and haulers of waste generated in Alameda County that is deposited in other counties," and that it "needs" the records, allegations contained in paragraphs 20 and 23 of the amended complaint: paragraph 20 alleges that "Enforcement of the Facility Fee Ordinance necessitates information about the source, tonnage, and haulers of waste generated in Alameda County that is deposited in other counties"; paragraph 23 alleges that the Authority "sent letters" asking Waste Connections to arrange for the Authority to review landfill records, which these letters "explained that the [] Authority needs these records to verify tonnage and jurisdiction of origin for purposes of the Disposal Reporting System, and for enforcement and collection of Facility Fee Ordinance." Both letters were attached to the first amended complaint.

Waste Connections denied both allegations, and denied the Authority's characterization of its own letters.[6]

Whether something is "necessitate[d]" by the fee ordinance, or whether the Authority "need[ed]" to review Waste Connections's records in order to

_____

[6] The majority recites for a full page the allegations Waste Connections "admitted," (Maj. Opn., at pp. 6–7), which the majority asserts were the "basic facts relevant to the parties' dispute." (*Ibid.*) The amended complaint was verified, which necessarily meant that Waste Connections would have to admit much of that alleged. Significantly, however, the majority nowhere describes what Waste Connections *denies*, which is what is pertinent on ruling on a plaintiff's motion for judgment on the pleadings.

Waste Connections's denial of the characterization of the letters was appropriate, as the characterizations are in fact incorrect: the letters do not mention the Disposal Reporting System or any issues or records related to it.

11

enforce its local fee ordinance are questions of fact, as cases at all levels have held for many, many years.  The following are illustrative:

*The Amelie* (1867) 73 U.S. 18, 27:  shipmaster may sell ship without owner permission where necessary, and "necessity is a question of fact";

*Ayres v. City Council of Los Angeles* (1949) 34 Cal.2d 31, 41:  "Questions of reasonableness and necessity depend on matters of fact";

*Carter v. Entercom Sacramento, LLC* (2013) 219 Cal.App.4th 337, 350:  "[B]ecause necessity is a question of fact, the issue for us is whether the trial court's determination that the additional expenditures were not necessary is supported by substantial evidence";

*Pacific Gas & Electric Co. v. Hay* (1977) 68 Cal.App.3d 905, 911:  "Necessity is a question of fact";  and

*Modesto Irrigation Dist. v. City of Modesto* (1962) 210 Cal.App.2d 652, 658:  "Questions of reasonableness and necessity depend on matters of fact."

In short, the answer to the question of necessity turns on factual information, including, for example, why were Waste Connections's records required?  What were the Authority's alternative sources of information?  And what was the extent of the records needed?  These, among many others, are questions of fact to be determined by a fact finder, factual determinations ignored by the trial court's ruling, a ruling the majority readily affirms.

The trial court characterized its holding as "rejecting defendants' proposed interpretation of 'necessary' that would require an undefined 'prerequisite showing for production.' "  Necessarily, a plaintiff must prove a required factual element of a claim in order to win a case.  The court's "rejection" of the need for the Authority to make a "showing" prerequisite to Waste Connections's "production" of documents—i.e., rejection of the need for the Authority to present evidence on a contested issue of fact before entry of

12

judgment in its favor—overlooks the fundamental requirement that a claim in court must be proven. And it ignores the law of judgment on the pleadings.

**The Law and the Standard of Review**

Code of Civil Procedure section 438, subdivision (c)(1)(A) provides that a plaintiff can move for judgment on the pleadings on only one ground: "that the complaint states facts sufficient to constitute a cause . . . of action against the defendant and the answer does not state facts sufficient to constitute a defense to the complaint." While the statute thus provides for such a motion by a plaintiff, cases affirming the granting of such motions are few and far between.[7]

As a leading Supreme Court case puts it, a plaintiff's motion for judgment on the pleadings "admits the untruths of [its] own allegations insofar as they have been controverted," and "all such averments must be disregarded when there is a direct and specific denial or an indirect denial by virtue of affirmative allegations of a contrary state of facts." (*MacIsaac v. Pozzo* (1945) 26 Cal.2d 809, 812–813 (*MacIsaac*).) Or as *MacIsaac* elsewhere said, we assume as true all facts properly pleaded in the answer and disregard all controverted allegations in the complaint. (*Ibid*; see also *Sebago, Inc. v. City of Alameda* (1989) 211 Cal.App.3d 1372, 1379.)

Here, as noted, Waste Connections's verified answer specifically denied the Authority's allegations of "necessitates" and "needs." We must accept as true those denials (*Rice v. Center Point, Inc.* (2007) 154 Cal.App.4th 949, 954), liberally construing the facts in favor of Waste Connections. (*Gerawan*

---

[7] A review of published opinions reveals only a handful of cases affirming a judgment on the pleadings for a plaintiff. Indeed, the trial court noted that in its 40 years of experience, 20 as a judge, 20 in private practice, it had never even seen such a motion.

*Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 516.) Put slightly differently, we must accept Waste Connections's version of the facts as true, and presume the untruth of any of the Authority's allegations that have been denied. (*MacIsaac, supra,* 26 Cal.2d at pp. 812–813.)

So, in reviewing an order to turn over records the Authority alleged were a "necessit[y]," records it "need[ed]," we must assume the opposite, that the records were not a "necessity[y]," and not "need[ed]." As the Supreme Court put it almost 100 years ago, "The denial in the answer" put the allegations "directly in issue and made it necessary for the plaintiff to introduce evidence thereof before he could become entitled to judgment." (*Cuneo v. Lawson* (1928) 203 Cal. 190, 193–194 (*Cuneo*).)

"[W]here the answer, fairly construed, suggests that the defendant may have a good defense, a motion for judgment on the pleadings should not be granted." (*Engine Manufacturers Assn. v. State Air Resources Bd.* (2014) 231 Cal.App.4th 1022, 1034.) And an answer that denies material allegations is a "good defense." Again, *Cuneo* is apt: "It requires no citation of authority to declare that the above-mentioned denials put in issue the assignment to the plaintiff of the promissory note and cause of action sued upon. [¶] As the answer sets up a good defense and denies material allegations of the complaint, it was sufficient as against a general demurrer, and the plaintiff was not entitled to judgment on the pleadings." (*Cuneo, supra,* 203 Cal. at pp. 193–194.) Neither was the Authority.

But there is another basis on which the holding can be reversed—that Waste Connections's verified denial of the "necessity" of the Authority and of its "need" to inspect the records raises a justiciable defense under the trial court's own definition. That is, the Authority argued, and the trial court agreed, that "as necessary" in subdivision (g)(2) means " 'that which is . . .

14

convenient, useful, appropriate, suitable, proper, or conducive' to ensuring compliance with . . . local fee provisions," quoting *Westphal v. Westphal* (1932) 122 Cal.App. 379, 382—a definition, not incidentally, the majority itself cites twice. (Maj. Opn., at pp. 8, 21.) So, to inspect records over Waste Connections's objection, the Authority must under its own definition allege and prove that the records it seeks to review would be "convenient, useful, appropriate, suitable, proper, or conducive" to enforce local fees. The Authority did not allege this. And it certainly did not prove it.

But even if it did, the trial court may not simply decide, on the pleadings, what is "convenient, useful," etc. These are questions of fact, answers to which require evidence. As our Supreme Court has held, the Authority's and trial court's own definition of "necessary"—"convenient, useful, appropriate, suitable, proper, or conducive"—means that the action must be "reasonably related" to its goal. (*San Francisco Fire Fighters Local 798 v. City and County of San Francisco, supra,* 38 Cal.4th at pp. 674–675 [the "reasonably related" test is the "more concise modern formulation" of the "convenient, useful [etc.]" test].) As we ourselves have noted, "the issue of reasonableness" is a "factual question." (*Contra Costa County v. Pinole Point Props., LLC* (2015) 235 Cal.App.4th 914, 925.)

Here, despite the breadth of the Authority's request—seeking all of Waste Connections's Alameda County-related records from landfills in three counties over more than three years—the trial court did not even attempt to evaluate reasonableness, whether the Authority's request was "convenient, useful," etc. to its fee enforcement work. Are all those records "necessitate[d?]" Are they all "need[ed?]" Or, to put it in the words of the Supreme Court, is the Authority's inspection of all of those records "reasonably related" to the enforcement of local fees?

15

Were all that not enough, I note that other than in its two conclusory words noted above, the Authority has not alleged why it needs from Waste Connections the information it seeks from it, and the necessity to obtain such sensitive commercial records cannot simply be presumed in the absence of an actual allegation—and evidence—to support it.  As indicated above, the Authority has other ways of obtaining records, the information it seeks available from other sources.  This is shown, for example, by the Authority's own local fee ordinance that requires all solid waste handlers doing business in Alameda County to keep highly detailed records about their waste handling activities, to report those activities in detail to the Authority on a monthly basis, and to provide any record to the Authority upon request.  (Alameda County Ord., §§ 7, 9.)  Moreover, CalRecycle also requires all commercial waste haulers to keep documentation verifying their tonnages by jurisdiction of origin, and to provide quarterly summaries to agencies like the Authority upon request.  (See Cal. Code Regs., tit. 14, § 18808.7, subd. (b)(9).)  The Authority simply has not alleged why Waste Connections's out-of-county hauler identification records are necessary in light of these other sources.

To sum up, the Authority filed a complaint that did not even plead the basis of its claimed need for Waste Connections's records, and Waste Connections filed a verified answer denying the necessity of the Authority's request.  Despite that, and despite the law of judgment on the pleadings, the trial court determined that the case was over—a determination the majority affirms.  This amounts to a rubber stamp of the Authority's request, the effect of which would be that there is nothing a recipient of a letter can do to contest a request by the Authority under subdivision (g)(2).

In light of this, prior to oral argument we sent a letter asking counsel to be prepared to address whether there was any constraint on the Authority's

16

rights, anything a recipient of its letter can do in any way contest the request. At oral argument counsel for Waste Connections quickly answered "yes" and cited to the "judicial review" referred to in subdivision (g)(3). Asked the same question, counsel for the Authority hemmed and hawed and hawed some more, finally saying that it "was what we filed here."[8]

With its focus on the 20 years of legislative history, the majority refers to "the emerging solid waste crisis in California," going on to discuss a parade of horribles, including "high profile cases of corrupt and fraudulent reports by landfills, recycling facilities and their employees", concluding that thus, "the purposes of the statute as a whole would be thwarted by" Waste Connections's reading of subdivision (g)(2). And in its penultimate paragraph the majority sets forth its conclusion: "Waste Connections's arguments fail because, as we have explained, the statute requires no showing of factual necessity and thus the pleadings present no factual issue. Rather, the Legislature itself determined that local governments' access to specified documents, including hauler information, *is necessary* to enforce such local fee requirements for those local governments that have adopted fee ordinances. . . ." (Maj. Opn., at p. 28, italics added.) But the Legislature did not say the information "is necessary," which would have been easy to say. No, it said the information can be inspected only "as necessary."

Because I would reverse the holding on the "as necessary" language, I would have to reach an issue the majority does not, the ruling by the trial court that the request from the Authority was a valid administrative subpoena. And I would conclude it was not.

---

[8] Counsel for the Authority also had no answer as to what an entity could do if its records were requested in an oppressive fashion, for example, every month or week. Nor did counsel know what an entity might do if the records requested were beyond those referred to in the statute.

## The Authority's Letter Was Not a Valid Administrative Subpoena

To briefly recap, when sustaining the demurrer without leave to amend, the trial court held Waste Connections would later have the right to challenge the ruling, noting "There is an opportunity for judicial review as provided at [Section 41821.5(g)(3)]." Then, in granting the motion for judgment on the pleadings, a different trial court referred to the earlier ruling, and held that it had already been determined that the letter was a valid administrative subpoena. Waste Connections argues this was error. I agree. But before explaining why, I address the Authority's contention that the argument was waived.

The Authority argues that Waste Connections waived its right to argue the subpoena issue because it does not argue error on the ruling on the demurrer. Indeed, the Authority goes so far as to assert that any such appeal would have been untimely, because the order sustaining the demurrer was filed in January, 2019, and the appeal not filed until August. This, of course, is wrong, as an order sustaining a demurrer without leave to amend is not appealable. (*Lopez v. Brown* (2013) 217 Cal.App.4th 1114, 1133). The only valid appeal is from the judgment. And that judgment was appealed, a judgment based in part on the court's conclusion that "the administrative subpoena is valid"—a quotation, I note, that appears twice in the Authority's own brief as a basis to uphold the court's decision. While the trial court incorporated the prior "analysis" from the demurrer decision, I know of no authority supporting any waiver—and the Authority offers none. And I turn to the merits of the argument.

In response to Waste Connections's argument, the Authority asserts that even if Waste Connections is correct that "reasonableness *can be* a question of fact, the courts are unanimous that the reasonableness of an

18

administrative subpoena in a question of law," in claimed support of which the Authority cites three cases: *State Water Resources Bd. v. Baldwin & Sons, Inc.* (2020) 45 Cal.App.5th 40; *Grafilo v. Cohanshohet* (2019) 32 Cal.App.5th 428; and *State ex rel. Dept. of Pesticide Regulation v. Pet Food Express* (2008) 165 Cal.App.4th 841. The cases have no applicability here, for several reasons.

First, the cases all involve Government Code section 11181, subdivision (e), which authorizes certain investigatory powers, including subpoenas, for state agencies and state department heads.[9] The Authority is, as noted, a county agency, it has no power to serve administrative subpoenas under Government Code section 11181, subdivision (e), and it did not purport to do so here, its document inspection request made under subdivision (g)(2).

Second, Government Code section 11181, subdivision (e) empowers state agencies to issue "subpoenas" compelling the "production" of documents that are "pertinent or material" to all manner of "inquiry, investigation, hearing," etc. in California, a broad power indeed. In contrast, subdivision (g)(2) contains an "as necessary" standard. If the Legislature had intended to give the Authority the power to review any document "pertinent or material" to the enforcement of local fees without regard to necessity, it could have done so.

---

[9] Government Code section 11181, subdivision (e) is found in Government Code, Title 2 ("Government of the State of California"), Division 3 ("Executive Department"), Part 1 ("State Departments and Agencies"), Chapter 2 ("State Departments"), Article 2 ("Investigations and Hearings"), it applies only to state, not local, departments. Moreover, the Authority is not empowered to serve administrative subpoenas under any other law or under its own inherent jurisdiction. Statutory authorization is required. (See, e.g., L. Modjeska, Admin. Law Practice & Proc. (2021) Subpoenas, Administrative Law Practice and Procedure, § 2:4.)

19

Third, in all three cases the court did in fact hear and evaluate evidence. In each case, the state entity issuing the subpoena filed a petition compelling compliance required by Government Code section 11187, subdivision (a). And in each case, the subpoena recipients filed declarations in response. In short, the respondents had an opportunity to contest, factually contest, the subpoenas. That did not happen here.

Last, but by no means incidentally, subdivision (g)(2) is not even a subpoena power at all, as the Authority cannot compel the production of documents, only onsite inspection.

_____
Richman, J.

*Alameda County Waste Management Authority v. Waste Connections US, Inc.* (A158323)

Trial Court:Contra Costa County Superior Court

Trial Judge:      Hon. Steven K. Austin

Counsel:

Beveridge & Diamond, Eric L. Klein, Gary J. Smith, James B. Slaughter, for Defendants and Appellants.

Shute, Mihaly & Weinberger, Ellison Folk, Joseph D. Petta, and Andrew P. Miller, for Plaintiff and Respondent.

Cole Huber, Derek P. Cole, as Amicus Curiae on behalf of

Plaintiff and Respondent.

1